



RECEIVED
IN LAKE CHARLES, LA

NOV 17 2016
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL ACTION NO. 2:14 -CR-00074-1** |
| | * | |
| **v.** | * | |
| | * | **JUDGE MINALDI** |
| **MARK ANTHONY THOMPSON** | * | |
| | * | |
| | * | **MAGISTRATE JUDGE KAY** |
| | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### MEMORANDUM RULING

Presently before the court is a Motion for a New Trial (Rec. Doc. 218) filed by the defendant, Mark Thompson. The government filed a response in opposition (Rec. Doc. 228), and Thompson filed a reply (Rec. Doc. 230). Thompson argues that he is entitled to a new trial based on the mental health evaluation of the government's key witness that they obtained after the trial. He raises four theories to support his argument: (1) a statement made in the mental health report was *Brady* evidence that should have been disclosed; (2) the mental condition of the witness was *Brady* evidence that should have been disclosed; (3) the report is newly discovered evidence which warrants a new trial; and (4) the government knowingly allowed the witness to testify falsely.  Thompson also requests an evidentiary hearing before deciding the Motion for a New Trial. For the following reasons, the court dismisses each of the defendant's theories and will **DENY** the Motion for a New Trial (Rec. Doc. 218).

### FACTS & PROCEDURAL HISTORY

On August 28, 2015, a jury found Thompson guilty of attempting to use a child to produce a visual depiction and attempting to entice a minor to engage in criminal sexual

1

activity.[1] Thompson had requested and received sexually suggestive pictures of a nine-year-old girl. The girl's mother, Rosalie Dornellas, sent Thompson the pictures and engaged in sexually explicit conversations about her daughter via text and online messages. After receiving a complaint from Dornellas's husband, Detective Stanford of the DeRidder police interviewed Dornellas about the messages and pictures. During the interview, Dornellas "initially denied having the intention of letting Thompson have sex with [her daughter,] that it was just his 'fantasy.'"[2] On April 9, 2014, both Thompson and Dornellas were indicted with one count of attempting use a child to produce a visual depiction and one count of attempting to entice a minor to engage in criminal sexual activity.[3]

On June 2, 2014, in preparation for her defense, Dornellas was interviewed and evaluated by a psychotherapist, Dr. Hasha. During the interview, Dornellas stated, "I think [that having sex with my daughter] was a fantasy [Thompson] had. I don't think he would do it." [4] Based on her interview with Dornellas, Dr. Hasha concluded that Dornellas suffered from major depression and post-traumatic stress disorder (PTSD).[5] However, she did not formally diagnose Dornellas. Dr. Hasha also suggested that Dornellas should receive therapy and further evaluation for possible pharmaceutical intervention.[6]

A little over a month after her meeting with Dr. Hasha, Dornellas met with Homeland Security Investigations (HSI) to discuss a plea bargain.[7] During the interview with HSI, Dornellas explained that she told the DeRidder detective Thompson's talk about having sex with

---

[1] Jury Verdict (Rec. Doc. 167).

[2] Report by Detective Joshua Stanford (Rec. Doc. 218-1), Ex. C, p. 34.

[3] Indictment (Rec. Doc. 27).

[4] Dr. Hasha's Report (Rec. Doc. 218-1), Ex. A, p. 18.

[5] Dr. Hasha's Report (Rec. Doc. 218-1), Ex. A, p. 20.

[6] Dr. Hasha's Report (Rec. Doc. 218-1), Ex. A, p. 20.

[7] HSI Report of Investigation (Rec. Doc. 228-7), Ex. G.

her daughter was just a fantasy.[8] The report created about the interview does not state that Dornellas believed that Thompson actually wanted to have sex with her daughter. One month later in August 2014, Dornellas signed a plea agreement with the government, in which she promised to plead guilty to attempting to use a child to produce a visual depiction and to cooperate as a witness in the case against Thompson.[9] On August 21, 2014, Dornellas pleaded guilty to this count in court.[10]

On April 20, 2015, before Thompson's trial, Thompson requested all of Dornellas's mental health records from the government. The government denied the request, and on May 18, 2015, Thompson filed a Motion to Compel Discovery.[11] In its response to the Motion to Compel, the government disclosed that it had Dr. Hasha's report.[12] This court held a hearing on June 9, 2015, during which the undersigned inspected the report *in camera* to determine whether it included exculpatory information.[13] After reviewing the report, the court determined that the report did not contain exculpatory information and denied the motion to compel.[14]

Thompson's trial took place during the last week of August 2015.  During the trial, Thompson argued that he was not trying to have sex with a child, and that all of his talk about having sex with Dornellas's daughter was a fantasy on which he would not act.[15] The government called Dornellas and her daughter as key witnesses. During her testimony, Dornellas

---

[8] HSI Report of Investigation (Rec. Doc. 228-7), Ex. G, p. 5.

[9] Plea Agreement (Rec. Doc. 228-6), Ex. F.

[10] Plea Hearing and Agreement Accepted (Rec. Docs. 87, 89).

[11] Motion to Compel (Rec. Doc. 118).

[12] Response to Motion to Compel (Rec. Doc. 123).

[13] Minutes of Court (Rec. Doc. 125).

[14] Minutes of Court (Rec. Doc. 125).

[15] *See, e.g.,* Direct Examination of Thompson (Rec. Doc. 211), p. 6, ln. 9-14.

explained the discussions that took place between her and Thompson.[16] She also opined that Thompson would have had sex with her daughter if she had allowed it.[17] Throughout her testimony, Dornellas explained that during her relationship with Thompson, she loved him and would continually do things that he asked.[18] She was also thoroughly cross-examined on her changing testimony—that she initially told the DeRidder police that she did not think Thompson would actually have sex with her daughter and then testified at trial that Thompson would.[19]

---

[16] *See* Direct Examination of Dornellas (Rec. Doc. 209), pp. 118-21.

[17] Q. Did you, Rosalie Dornellas, in your mind agree that if Mark [Thompson]-- decide that if Mark came that you would, in his presence, allow him to have sex with your daughter? Did you decide that you would really do that, not talk about it, really do it?

A. In my heart, in my heart, I would not let him have sex with [my daughter].

Q. Right.

A. But I know if I let him have sex with my daughter he would have.

Trial Transcript (Rec. Doc. 210), p. 121, ln. 8-17.

[18] Q. And you feel like in order to please him you need to send him a photograph?

A. Because I love Mark that time. He was everything to me and all -- whatever he ask is -- I did my best -- I did do it because he feel me -- he make me feel like I'm –

Q. Except that you would –

A. -- and he makes me feel that I'm beautiful. He makes me feel that I'm worth living for and...

Q. You loved him?

A. Yes, I love -- I was in love with Mark. And then whenever he was asking me to do, I was -- I did.

Trial Transcript (Rec. Doc. 210), p. 110, ln. 15-25.

[19] Q. And you told a completely different story to [the HSI agent] than you did to [the DeRidder detective], didn't you?

A. Because –

Q. Was that a yes or a no?

A. Yes, because the first time I did try to cover Mark. When I was arrested I did my best to not get him in trouble.

Q. So when you told -- when you told [the DeRidder detective]-- did you tell [the HSI agent] that [the DeRidder detective] thought that you had lied to him and told you that?

A. I know I have lied to them a lot of questions, I know that myself, because I was trying to cover Mark at that time.

Trial Transcript (Rec. Doc. 210), p. 163-64, ln. 14-20, 1.

Dornellas explained that her testimony changed because when she talked to the DeRidder police she loved Thompson and was covering for him.

Dornellas never stated whether she had told other people that she thought Thompson's obsession with her daughter was just a fantasy on which he would not act. The only statements on this subject were her statements to the DeRidder police, the HSI agent, and those made in court. The government also admitted the text of conversations that took place between Thompson and Dornellas.[20] Based on witness testimony and admitted evidence, the jury convicted Thompson on both counts,[21] meaning that the jury did not believe that Thompson's sexual interest in Dornellas nine-year-old daughter was just fantasy.

Thompson then appealed his conviction. On July 26, 2016, Thompson filed a motion to supplement the appellate record with Dornellas' presentence report (PSR) and the Fifth Circuit granted the motion.[22] The Western District of Louisiana provided the requested documents and include in the requested documents was a copy of Dornellas's PSR. Dr. Hasha's report was attached as an exhibit to the PSR. After receiving the documents, Thompson filed a Motion for a New Trial (Rec. Doc. 183) in this court and filed a Motion to Stay the Briefing Schedule and Remand in the Fifth Circuit Court of Appeals. The Fifth Circuit granted the Motion for a Stay of

---

[20] The following are excerpts from text message conversations.

> Dornellas: "[Y]ou are best whore than I am ... nigger whore wants to fuck my daughter [...] Your big fat nigger dick would be so fat in my daughters pussy: .. but she can handle it I think ..."

> Thompson: "That is so beautiful my love!!! OMG!!! You know how to fuck with my head my baby!!! I can't take it anymore!!"

(Rec. Doc. 163-11), p. 3.

> Thompson: "Babe you see how clear the photo was of your panties, it's how I would like for the pic of [your duaghter's] Pussy to look."

> Dornellas: "I love you ... yes babe I will make sure it would be clear like [t]hat."

(Rec. Doc. 163-11), p. 4.

[21] Jury Verdict (Rec. Doc. 167).

[22] Unopposed Motion for Leave to Supplement the Record on Appeal (Appeal Rec. Docs. 53, 61), *United States v. Thompson*, 15-31083 (5th Cir.).

the Briefing Schedule and remanded the case to this court "for the limited purpose of ruling on his motion for [a] new trial."[23]

Thompson argues that the non-disclosure of Dr. Hasha's report entitles him to a new trial on four grounds: (1) Dornellas's statement in Dr. Hasha's report that she didn't think Thompson would act on his talk about having sex with her daughter was *Brady* evidence that should have been disclosed; (2) Dr. Hasha's characterization of Dornellas's mental condition was *Brady* impeachment evidence that should have been disclosed; (3) the report is newly discovered evidence which warrants a new trial; and (4) the government knowingly allowed Dornellas to testify at trial that she told only the DeRidder police that she thought that Thompson's talk of having sex with her daughter was a fantasy when the government knew that she had told Dr. Hasha the same thing. The government argues that the non-disclosure of Dr. Hasha's report does not merit a new trial under the standard for *Brady* evidence or the standard for newly discovered evidence because the report was not "discovered" after the trial, and the report does not create a reasonable probability of a different outcome. Further, the government argues that Dornellas did not make any false statements on the stand, and any potentially false statements were immaterial.

Additionally, Thompson argues that the court should hold an evidentiary hearing because Dr. Hasha's report is entitled "Preliminary Report" and an evidentiary hearing would elucidate whether Dornellas sought subsequent treatment or medication. The defendant also argues that an evidentiary hearing is necessary to determine whether the report reviewed *in camera* during the defendant's motion to compel is the same report that was attached to Dornellas's PSR. In its response, the government attached the email that was sent to chambers with the attached report, showing that the report reviewed *in camera* by the undersigned is the same report that was

---

[23] Non-Dispositive Court Order (Appeal Rec. Doc. 92), *United States v. Thompson*, 15-31083 (5th Cir.).

attached to Dornellas's PSR.[24] The government also included a final report that was completed by Dr. Hasha in September 2015 and an affidavit by Dr. Hasha, explaining Dornellas's treatment before she testified at trial.[25]

## LAW & ANALYSIS

### I.   Evidentiary Hearing

First, the court finds that an evidentiary hearing is unnecessary to resolve Thompson's Motion for a New Trial. "Generally, a motion for new trial may be decided upon affidavits without evidentiary hearings." *United States v. Metz*, 652 F.2d 478, 481 (5th Cir. 1981) (citing *United States v. Dara*, 429 F.2d 513, 514 (5th Cir. 1970); *Gurleski v. United States*, 405 F.2d 253, 267 (5th Cir. 1968)). The affidavits and evidence included by both parties resolve the factual uncertainties that Thompson raises regarding Dornellas's treatment and which report the court reviewed *in camera*. Accordingly, the defendant's request for an evidentiary hearing is **DENIED**.

### II.   Motion for a New Trial Based on Dr. Hasha's Report

A defendant can move for a new trial based on newly discovered evidence. Fed. R. Crim. P. 33(b)(1).

> As a general rule, to obtain a new trial based on newly-discovered evidence, a defendant must demonstrate that: (1) the evidence was discovered after trial; (2) the failure to discover the evidence was not due to the defendant's lack of diligence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) a new trial would probably produce a new result. However, when a motion for new trial based on newly-discovered evidence raises a *Brady* claim, this court instead applies the three-prong *Brady* test to determine whether a new trial is appropriate.

---

[24] Email from Namie (Rec. Doc. 228-2), Ex. B

[25] Final Report and Affidavit (Rec. Docs. 228-8, 228-11), Exs. H, K.

*United States v. Runyan*, 290 F.3d 223, 246–47 (5th Cir. 2002) (citations omitted). A new trial is

appropriate under a *Brady* claim if the defendants shows that: "(1) evidence was suppressed; (2)

the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was

material to either guilt or punishment." *Id.* (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).

Evidence is material to guilt or punishment when it creates a "reasonable probability" of a

different outcome, that is "if the failure to disclose the suppressed evidence 'could reasonably …

put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.*

(citing *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). Here, the statements contained in Dr.

Hasha's report would neither make a new result probable under the general new evidence

standard nor make a new result a reasonable probability under the *Brady* standard.

### a. Alleged *Brady* Violations

Thompson argues that two statements in Dr. Hasha's report were exculpatory *Brady*

evidence that the government was obligated to turnover—that Dornellas did not think that

Thompson would actually have sex with her daughter and that Dr. Hasha believed that Dornellas

needed treatment for depression and PTSD. Even assuming that both of these statements were

suppressed, newly discovered evidence, Thompson has not shown that the evidence is material to

guilt or innocence.[26]

### i. Dornellas's Statement That Thompson Wanting to Have Sex with Her Daughter Was a Fantasy

First, the statement that Dornellas made to Dr. Hasha that she did not *think* that

Thompson would actually have sex with her daughter, that it was Thompson's fantasy, would not

have a reasonable probability of changing the outcome of the trial. The defendant raised the

---

[26] Because Dr. Hasha's report was reviewed by the court *in camera*, and the court determined that it was not *Brady* evidence, the report is likely not newly discovered suppressed evidence. The Ninth Circuit has stated that evidence that has been turned over to the court for *in camera* review is not suppressed, and therefore it cannot violate *Brady*. *See United States v. Rasmussen*, 43 F. App'x 48, 50 (9th Cir. 2002).

fantasy argument in trial, and the jury dismissed it. The defendant cross-examined Dornellas on a similar statement that she made to the DeRidder detective. The defendant thoroughly cross-examined and impeached Dornellas on her changing conclusion regarding whether Thompson would have actually had sex with her daughter, and Dornellas even admitted that she lied in her previous statements. Dornellas also explained her mindset during her relationship with Thompson, essentially that her love for Thompson drove her to cover for him. The statement that she made to the DeRidder detective was more definitive, that Thompson would not have acted on his fantasy, than the statement she made to Dr. Hasha, that she did not *think* that Thompson would have acted on his fantasy. This would align with Dornellas's testimony and the government's theory that Dornellas was manipulated by Thompson, and after some time, Dornellas began to realize the manipulation. Considering all of this, her statement made to Dr. Hasha would not have a reasonable probability of changing the outcome of the trial.

Further, the defendant's conviction did not rest solely on the testimony of Dornellas. The government introduced transcripts text message conversations between Thompson and Dornellas.[27] In those conversations, Thompson directly discussed his sexual interest in underage children and with Dornellas's daughter in particular. With such strong evidence, a statement made by someone who admitted to being manipulated by Thompson that she did not think that Thompson would act on his fantasy would not have a reasonable probability of changing the outcome. In fact, her statements made to Dr. Hasha likely bolster the government's version of events, that Dornellas was manipulated by Thompson and did not see him as the threat he was.

---

[27] (Rec. Doc. 163-11).

### ii.   Dr. Hasha's Conclusions About Dornellas's Mental State

Second, Dr. Hasha's medical conclusions would not have a reasonable probability of changing the outcome of the trial. A defendant has a right to challenge the credibility of a witness, and the government must disclose impeachment material regarding the witness. *United States v. Jimenez*, 256 F.3d 330, 343 (5th Cir. 2001). If a witness has a mental illness or impairment that affects her "her ability to comprehend, know, and correctly relate the truth" the government must disclose the impairment. *Id.* (citing *United States v. Partin*, 493 F.2d 750, 762 (5th Cir.1974)). Even if the court does consider Dr. Hasha's conclusions about Dornellas's mental state as helpful newly discovered evidence, these conclusions would not have a reasonable probability of producing a different outcome. The defendant argues that the following statements made by Dr. Hasha would have undermined Dornellas's testimony:

> [Her attorney] and I both strongly encouraged that she seek immediate medical care. Her lack of initiative in this situation is indicative of low self-esteem and shame. During the interview, Rosalie exhibited symptoms of major depression, including low self-esteem, self-loathing, and shame. At times she appeared to be detached from her experiences and unable to comprehend the severity of the reality of her circumstances, consistent with PTSD. She had difficulty understanding concepts and exhibited a level consistent with the cognitive development of a 6 or 7 year old, meaning that she could only comprehend and explain things in a very concrete way. She is incapable of abstract thinking or of conceptualizing about the future or long-term consequences....Additionally she requires therapy and psychiatric evaluation for possible pharmaceutical intervention for depression.[She exhibits s]ymptoms of depersonalization and possible derealization.[28]

The court disagrees with the defendant. First, Dr. Hasha's statements about Dornellas symptoms and impairments in processing reality would more likely be harmful to the defendant than helpful. Throughout her testimony Dornellas was often confused and did not understand the

---

[28] Dr. Hasha's Report (Rec. Doc. 218-1), Ex. A, p. 20.

question.[29] She also made conflicting statements.[30] Usually, these would be signs of

untrustworthiness, but Dr. Hasha's statements would explain Dornellas's behavior in answering

questions, bolstering Dornellas's credibility. The symptoms which indicated that Dornellas

suffered from depression and PTSD do not suggest that Dornellas was incapable of telling the

truth. Second, the government has attached an affidavit of Dr. Hasha completed after Dornellas

testified, clarifying that at the time of the trial Dornellas was not taking medication.[31] Therefore,

Dornellas's testimony cannot be discredited based on medication that she could have been taking

at the time of testimony. Finally, the text message conversations that took place between

Dornellas and Thompson were strong evidence that Thompson intended to have sex with

Dornellas nine-year-old daughter, and taking into account these written conversations, whether

Dornellas suffered from the symptoms of depression and/or PTSD would be very unlikely to

---

[29] *See, e.g.*, Cross Examination of Dornellas (Rec. Doc. 210), pp. 163-168

[30] *See, e.g.*, Cross Examination of Dornellas (Rec. Doc. 210), pp. 120-21 (stating that she would do anything Thompson asked, but that in her heart, she did not want him to have sex with her daughter).

> Q. Now, he was suggesting that he wanted to have oral sex with your daughter, right? Isn't that what that's talking about?
>
> A. He wanted to have sex with my daughter.
>
> Q. All right. Now, this is in October of 2014. Had you decided at the time this was written that you -- that you would permit Mark [Thompson] to have oral sex with your daughter? ...
>
> A. I -- yes, I did agree to the message.
>
> Q. And was that real? Were you really going to do that?
>
> A. I say that because, excuse me, I was -- I was in love with Mark [Thompson]. Anything that he asked me to do, I was doing it. ...
>
> Q. Did you, Rosalie Dornellas, in your mind agree that if Mark -- decide that if Mark came that you would, in his presence, allow him to have sex with your daughter? Did you decide that you would really do that, not talk about it, really do it?
>
> A. In my heart, in my heart, I would not let him have sex with [my daughter].
>
> Q. Right.
>
> A. But I know if I let him have sex with my daughter he would have.

*Id.*

[31] Affidavit (Rec. Doc. 228-11), Ex. K.

change the outcome of the trial. Accordingly, Dr. Hasha's mental health conclusions are not grounds for a new trial.

### b. Dr. Hasha's Report as Newly Discovered Non-*Brady* Evidence

The court also notes that Dr. Hasha's report is not grounds for a new trial even if it is considered newly discovered non-*Brady* evidence. In addition to having to be material, the introduction of newly discovered evidence that is not *Brady* material must "probably produce a new result." *Runyan*, 290 F.3d at 246–47. The material standard is the same for both types of evidence. *Id.* Therefore, because Thompson did not meet this standard regarding potential *Brady* material, he has not met the standard regarding generally newly discovered evidence. The discovery of the report does not justify a new trial under either the *Brady* or non-*Brady* standard.

### III. Motion for a New Trial Based on the Government Allowing Dornellas to Falsely Testify

Finally, the defendant argues that he is entitled to a new trial because the government knowingly allowed Dornellas to testify that she never told anyone except for the DeRidder detective that Thompson would not actually have sex with her daughter, that it was a fantasy. Under *Napue v. Illinois,* 360 U.S. 264 (1959), if the government solicits or fails to correct false testimony, the defendant may be entitled to a new trial. *United States v. Stanford*, 823 F.3d 814, 838 (5th Cir. 2016) "[A] new trial based upon a *Napue* violation is proper only if (1) the statements in question are shown to be actually false; (2) the prosecution knew that they were false; and (3) the statements were material." *Id.* at 838-39 (quoting *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir.1997)). "The Supreme Court has 'defined materiality in terms of a 'reasonable probability' of a different outcome,' which 'results when nondisclosure places the case in a different light so as to undermine confidence in the verdict.'" *Id.* (quoting *O'Keefe*, 128 F.3d at 893). Here, a new trial is not proper.

First, Dornellas never made an affirmative statement in either direct or cross examination that the DeRidder detective was the only person she told that Thompson would not have actually had sex with her daughter. Nor did she make a statement that after she told the DeRidder detective that it was just Thompson's fantasy that she told every subsequent person a different version of events. When asked about her statements to the police, Dornellas explained that she lied to the DeRidder detective and did her best to tell the truth to the HSI agent.[32] The defendant's characterization of Dornellas's testimony is misleading and does not take into account the context of her answers. Accordingly based on a review of the record, Dornellas did not make a false statement, and the government did not commit a *Napue* violation.

Further, even if she had lied about whether she told another person that she thought Thompson would not actually act on his fantasy, this would not have created a reasonable probability of a different outcome. As previously discussed, she was cross examined on her inconsistent statements, and the jury also relied on the actual text of the conversations between Dornellas and Thompson. Hearing that she had told a medical professional that she thought Thompson would not have actually had sex with her daughter before telling any officer otherwise would not create a reasonable probability for the jury to come to a different outcome.

## CONCLUSION

The court declines to conduct an evidentiary hearing because the trial transcripts and attached affidavits eliminate its necessity. Also, the defendant's Motion for a New Trial is denied because Dornellas statements to Dr. Hasha and Dr. Hasha's conclusions about Dornellas mental health do not create a reasonable probability of a different outcome. Finally, the defendant is not

---

[32] *See* Cross Examination of Dornellas (Rec. Doc. 210), pp. 163-68.

13

entitled to a new trial under *Napue* because Dornellas did not make a false statement on the stand, and any potentially misleading statements are immaterial. Accordingly,

The defendant's Motion for a New Trial (Rec. Doc. 218) will be **DENIED.**

Lake Charles, Louisiana, this 12 day of _____ NOV _____ , 2016.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE